**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Berga Habetamu Shibeshi,<br>Plaintiff,<br>v.<br>David R Rivas, et al.,<br>Respondents. | No. CV-26-02511-PHX-SHD (JZB)<br>**REPORT AND RECOMMENDATION** |

**TO THE HONORABLE SHARAD H. DESAI, UNITED STATES DISTRICT JUDGE**:

Pending before the Court is Petitioner Berga Shibeshi's "Petition for Writ of Habeas Corpus."[1] (Doc. 1.)

## I. SUMMARY OF CONCLUSIONS.

Petitioner is subject to mandatory detention pursuant to 8 U.S.C. § 1225(b)(2) by the Department of Homeland Security ("DHS") Immigration and Customs Enforcement ("ICE") and has been detained since March 4, 2025. (Doc. 1 at 5.) Most recently, on December 19, 2025, an Immigration Judge ("IJ") denied Petitioner's application for asylum, withholding of removal under the Immigration and Nationality Act ("INA") § 241(b)(3), and withholding of removal under the Convention Against Torture (the "Asylum Application") and ordered that Petitioner be removed to Uganda. (*Id.* at 19–22.) Petitioner appealed the decision to the Board of Immigration Appeals ("BIA") on January 14, 2026.

[1] This action was referred to this Court "for further proceedings and a report and recommendation". (Doc. 3 at 4.)

(*Id.* at 23–26.) His appeal remains pending. (Doc. 10 at 2.)

Considering Petitioner's 16-month detention and the liberty interest at stake, the Court concludes that Petitioner's continued detention offends due process as applied in the specific circumstances of this action. Therefore, the Court **recommends** the Petition be **granted in part and denied in part**. Specifically, the Court recommends that Petitioner be granted an individualized bond hearing. Furthermore, the Court recommends that, at the bond hearing, the government bears the burden of proving that Petitioner is a danger or flight risk by clear and convincing evidence.

## II. BACKGROUND.

Petitioner is a native and citizen of Ethiopia. (Doc. 1 at 4.) On or about March 4, 2025, Petitioner entered the country without admission, inspection, or parole and was detained within one mile of the border. (Doc. 10 at 1.) Petitioner was referred to the United States Citizenship and Immigration Services, where an officer made a positive fear finding. (*Id.*)

On July 9, 2025, Petitioner was served with a Notice to Appear that charged his as inadmissible under INA §§ 212(a)(6)(A)(i) and 212(a)(7)(A)(i)(I)—codified at 8 U.S.C. §§ 1182(a)(6)(A)(i)[2] and (a)(7)(A)(i)(I),[3] respectively. (*Id.* at 1–2); (Doc. 10-3 at 2.) On or after this time, Petitioner filed his Asylum Application. See (doc. 1 at 19.)

On December 19, 2025, an IJ denied Petitioner's Asylum Application and ordered that Petitioner be removed to Uganda. (*Id.* at 19–22.) Petitioner timely appealed the decision to the BIA on January 14, 2026. (*Id.* at 23–26.) The appeal remains pending.

On April 10, 2026, Petitioner filed the instant Petition *pro se*. (*Id.* at 1.) In his Petition, Petitioner assert that his prolonged immigration detention violates the due process

---

[2] This provision states that a noncitizen "present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." 8 U.S.C. §1182(a)(6)(A)(i).

[3] This provision states that an immigrant "who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title . . . is inadmissible." 8 U.S.C. §1182(a)(7)(A)(i)(I).

clause of the Fifth Amendment. (*Id.* at 16–17.) On April 14, 2026, the District Court ordered Respondents to respond to the Petition. (Doc. 3.) Due to Respondents' failure to timely respond, this Court issued an Order to Show Cause on May 26, 2026. (Doc. 9.) Thereafter, Respondents filed a Response on May 29, 2026. (Doc. 10.) In their Response, Respondents assert that: (1) Petitioner is held pursuant to 8 U.S.C. § 1225(b)(1); (2) that his detention is statutorily mandated; (3) that Petitioner's due process claims are foreclosed by the entry fiction doctrine; and (4) that Petitioner is not a *Bautista* class member. (*Id.* at 2–5.)

Petitioner has failed to file a reply, and the time for doing so has expired. For the following reasons, the Court finds that Petitioner is entitled to a bond hearing.

**III. 28 U.S.C. § 2241 WRIT OF HABEAS CORPUS.**

The district court is empowered to issue a writ of habeas corpus where an individual is held "in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c)(3). The language of § 2241 and "the common-law history of the writ" makes clear "that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475 484 (1973) (noting that the writ of habeas corpus "was early recognized by [the Supreme] Court as a 'great constitutional privilege'") (quoting *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807)); *cf. In re Kaine*, 55 U.S. (14 How.) 103 (1852) (applying the writ of habeas corpus in the immigration context). The Supreme Court has made clear that § 2241 applies to noncitizens[4] challenging

[4] Undersigned shall use the term 'noncitizen' unless a quoted statute or court decision uses the term 'alien.' This usage is congruent with the Ninth Circuit Court of Appeals' precedent, such as *Avilez v. Garland*, which specifically stated:

> This opinion uses the term noncitizen unless quoting language from the immigration statutes or past opinions containing the term alien. There are two reasons behind this choice. First, use of the term noncitizen has become a common practice of the Supreme Court[.] Second, even if that were not the case, careful writers avoid language that reasonable readers might find offensive or distracting—unless the biased language is central to the meaning of the writing. The word alien can suggest "strange," "different," "repugnant," "hostile," and "opposed," . . . while the word noncitizen, which is synonymous, . . . avoids such connotations. Thus, noncitizen seems the better choice.

*Avilez v. Garland*, 69 F.4th 525, 527 n.1 (9th Cir. 2023) (cleaned up).

their immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

Because Petitioner only challenges his prolonged civil detention, the Court has jurisdiction to address the instant Petition. *See Lopez-Marroquin v. Barr*, 955 F.3d 759, 759 (9th Cir. 2020) ("[D]istrict courts retain jurisdiction under 28 U.S.C. § 2241 to consider habeas challenges to immigration detention that are sufficiently independent of the merits of the removal order[.]").

**IV. DISCUSSION.**

**A. Statutory Basis for Petitioner's Detention.**

"A noncitizen's place within this statutory scheme can affect whether his detention is mandatory or discretionary, as well as the kind of review process available to him if he wishes to contest the necessity of his detention." *Avilez v. Garland*, 69 F.4th 525, 529 (9th Cir. 2023) (cleaned up). Given that Petitioner was placed in 8 U.S.C. § 1229a traditional removal proceedings considering his hearing before an IJ on his Asylum Application, (doc. 1 at 19–22), Petitioner's detention falls under 8 U.S.C. § 1225(b)(2).

**B. Due Process.**

The Court turns to Petitioner's due process claim. The Court's due process analysis is separated into two steps: "[F]irst[, the Court] ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so[, the Court] ask[s] whether the procedures followed by the [government] were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

***1. Liberty Interest.***

"A liberty interest may arise from the Constitution itself[5] . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). If a liberty interest is found, the Court then determines whether the administrative procedures are sufficient considering the "particular situation."[6]

---

[5] "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690.

[6] The Court notes that due process is a flexible concept. This, however, "does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all

*Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

In the instant action, the parties disagree whether Petitioner possesses a cognizable liberty interest. Petitioner argues that he has a liberty interest in being free from prolonged civil commitment. (Doc. 1 at 6–7.) Respondents contend that the entry fiction doctrine limits Petitioner's due process liberty interests to those procedures created by statute. (Doc. 10 at 2–4.) The Court disagrees with Respondents' reliance upon the entry fiction doctrine in the instant action.

The entry fiction doctrine asserted by Respondents is based upon the "distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958). The Supreme Court has noted that the latter category of noncitizens have "additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" *Id.* (quoting *Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 212 (1953)); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned") (quoting *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)). Those noncitizens who are on the "threshold of initial entry" are not considered "to have 'effected an entry[.]'" *Thuraissigiam*, 591 U.S. at 140 (quoting *Zadvydas*, 533 U.S. at 693). Put differently, "[w]hen an alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but the alien is not considered to have entered the country[.]" *Thuraissigiam*, 591 U.S. at 139. Therefore, while a citizen may be physically present within the country, they were "still in theory of law at the boundary line and had gained no foothold in the United States[.]" *Zadvydas*, 533 U.S. at 693 (quoting *Kaplan v. Tod*, 267 U.S. 228, 257–58 (1925)).

This distinction is predicated upon the following "fundamental proposition: 'The

---

situations calling for procedural safeguards call for the same kind of procedure." *Morrissey*, 408 U.S. at 481.

power to admit or exclude aliens is a sovereign prerogative.'" *Thuraissigiam*, 591 U.S. at 139 (cleaned up) (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)). "The Constitution gives 'the political department of the government' plenary authority to decide which aliens to admit, . . . and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted." *Thuraissigiam*, 591 U.S. at 139 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892)).

Although the entry fiction doctrine is of judicial construction, its current application rests upon the text of the INA as modified by the 1996 Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). The 1996 IIRIRA modified the INA to "no longer denominate[] in terms of 'entry' and 'exclusion,'" instead replacing the "terms with the broader concept of 'admission.'" *Guo XI v. INS*, 298 F.3d 832, 838 (9th Cir. 2002). The INA, as it stands today, defines admission of a noncitizen as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Directly following the aforementioned provision is the following caveat: "An alien who is paroled under section 212(d)(5)"—codified at 8 U.S.C. § 1182(d)(5)[7]—"shall not be considered to have been admitted." *Id.* § 1101(a)(13)(B). This caveat is important to consider, because under the INA, a noncitizen held under 8 U.S.C. § 1225(b)(2) has only one explicit avenue of release pending adjudication of their asylum case: release upon humanitarian parole. *See Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018).

Based upon the text of the INA as modified by the IIRIRA, two important considerations arise: (1) admissions—or 'entry' as used prior to the enactment of the IIRIRA in 1996—means the lawful entry of a noncitizen after inspection and authorization by a DHS authority; and (2) that humanitarian parole under 8 U.S.C. § 1182(d)(5) statutorily does not amount to admissions. With these considerations in mind, the Court turns to the exact issue of whether a bond hearing and the prospect of release on bond outside of the 8 U.S.C. § 1182(d)(5) context amounts to admissions under the text of the

[7] Under the provision, a noncitizen may be temporarily released on parole "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

INA. If it does, the entry fiction doctrine would limit a noncitizen held under 8 U.S.C. § 1225(b)(2) to the procedures solely authorized in the INA, which does not allow for release outside of the humanitarian parole context. *See Thuraissigiam*, 591 U.S. at 139 (noting that Congress has the plenary authority to decide whether to admit a noncitizen) (citing *Nishimura Ekiu*, 142 U.S. at 659). However, if release on bond does not equate admission, then the legal fiction is inapplicable. To solve this puzzle, the Court must employ the tools of statutory interpretation.

The Court first turns towards the INA's usage of "paroled" under § 1101(a)(13)(B). As the statute reads, where a noncitizen is paroled under 8 U.S.C. § 1182(d)(5), they "shall not be considered to have been admitted." 8 U.S.C. § 1101(a)(13)(B). So then, does this mean that any non-humanitarian parole outside of the 8 U.S.C. § 1182(d)(5) context mean that the citizen has been admitted to the country? Undersigned does not find so. In analyzing this provision, the Court must first employ the interpretive principle of "*verba cum effectu sunt accipienda*—that if possible, every word and every provision is to be given effect[.]" *United States ex rel. Welch v. My Left Foot Children's Therapy*, LLC, 871 F.3d 791, 797 (9th Cir. 2017). Specifically, the Court applies this interpretive principle to the term "parole" because Congress's choice of this term "cannot be meaningless, else [it] would not have been used." *United States v. Butler*, 297 U.S. 1, 65 (1936).

The term parole, as it is used in the common vernacular, means "a conditional release of a prisoner serving an indeterminate or unexpired sentence." *Parole*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). In its technical form, parole means "[t]he temporary release of an inadmissible alien into the United States for urgent humanitarian reasons or for significant public benefit." *Parole*, BLACK'S LAW DICTIONARY (12th ed. 2024). The common undercurrent between the common and technical understanding of the term parole is that the individual's release is ***conditional***, meaning that it may be revoked at the discretion of the supervising authority.

Now then, the Court turns towards the particular issue at hand: bond hearings and a potential release on bond. As understood in the common parlance, a bond is "an obligation

made binding by a money forfeit." *Bond*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). In other words, a bond is a sum of money paid to promise that someone will appear, with a risk that such a fund may be forfeited due to their non-appearance. Such definition is in conformity with the legal definition of bond. *See Appearance Bond*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A bond given to a court by a . . . defendant's surety to guarantee that the defendant will duly appear in court in future and, if the defendant is jailed, to obtain the defendant's release from confinement."); *see also Bond*, GARNER'S DICTIONARY OF LEGAL USAGE (3rd ed. 2011) ("[S]ecurity for a released prisoner's return for trial[.]"). As both the common and legal usage of bond establish, a release on bond is ***conditional***.

Given that release on bond, based on the common and technical understanding of the term, is akin to release on parole in that is conditional, it is apparent that release on bond—like release on parole—would not equate an admission. Such a finding is further supported by the avoidance doctrine, wherein the Court must choose between "plausible interpretations of a provision," *Warger v. Shauers*, 574 U.S. 40, 50 (2014) (citation omitted), "to avoid rendering them unconstitutional[.]" *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019) (citing *Parsons v. Bedford*, 28 U.S. (3 Peters) 433, 448–49 (1830) ("No court ought, unless the terms of an act rendered it unavoidable, to give a construction to it which should involve a violation, however unintentional, of the constitution.")). Additionally, this textual finding is supported by the fact that neither release on parole nor release on bond change a petitioner's immigration status nor their right to remain in the country. *See United States v. Balde*, 943 F.3d 73, 84 (2d Cir. 2019) (noting that parole "does not change [the] parolee['s] immigration status: they remain at the border for the purposes of immigration law and are treated as applicants for admission into the country") (citation omitted); *see also Manpreet Singh v. Unknown Party*, No. CV-26-01057-PHX-RM (DMF), 2026 U.S. Dist. LEXIS 88379, at *13 (D. Ariz. Apr. 22, 2026) (noting that release on bond would not change the fact that a petitioner "will be subject to the same removal proceedings as before, with no new right to remain") (quoting *Rincon v. Hyde*,

810 F. Supp. 3d 101, 107 (D. Mass. 2025)). Hence, it is apparent under a pure textual review that seeking a conditional release on bond, while not explicitly provided for in the statute, would not amount to admissions under the INA.

This textual finding is supported by numerous courts, both in this District and its sister districts, that have held the entry fiction applies to the procedural rights of noncitizens regarding *admission*, not *every* procedure occurring in the immigration context—*i.e.*, the entry fiction doctrine is inapplicable to challenges of a petitioner's length of detention. *See D.V.D. v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2026 WL 521557, at *28–31 (D. Mass. Feb. 25, 2026)[8]; *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1170–72 (W.D. Wash. 2023). These decisions, their progeny, and similar such decisions in numerous district courts interpreting the entry fiction doctrine, are based on a finding that arriving noncitizens, such as Petitioner, have "only those rights *regarding admission* that Congress has provided by statute." *Thuraissigiam*, 591 U.S. at 140 (emphasis added).

For example, the district court in *D.V.D v. U.S. Dep't of Homeland Sec.* recently illustrated why the entry fiction doctrine does not foreclose Petitioner's as-applied challenge to the length of their detention. In *D.V.D.*, the court noted that, although the entry fiction doctrine "provide[d] an exception to the otherwise geographic scope of the Due Process Clause," the doctrine only impacted those due process rights "regarding admission." *D.V.D.*, 2026 WL 521557, at *30 (cleaned up) (quoting *Thuraissigiam*, 591 U.S. at 140). The court proceeded to "distinguish rights regarding admission," which relates to the government's "sovereign authority to admit noncitizens only in cases as it may see fit," with other interests that might be implicated by the Due Process Clause.

---

[8] While the Court acknowledges that *D.V.D.* is an out-of-circuit decision that is currently stayed by the First Circuit, undersigned is nonetheless persuaded by the analysis contained within *D.V.D.* Furthermore, the Court does not stand alone within this District in relying upon *D.V.D. See Khasanova v. Rokosky*, No. CV-26-00763-PHX-JCH (JFM), 2026 U.S. Dist. LEXIS 139896, at *8 (D. Ariz. June 24, 2026); *see also Zinaida v. Lyons*, No. CV-26-02866-PHX-RM (MTM), 2026 U.S. Dist. LEXIS 122386, at *4 (D. Ariz. June 3, 2026); *Salamakhin v. Noem*, No. CV-26-00330-PHX-AMM (MTM), 2026 U.S. Dist. LEXIS 103033, at *9 (D. Ariz. May 6, 2026); *Mozhubaev v. Rosa*, No. CV-26-00505-PHX-DJH, 2026 U.S. Dist. LEXIS 113646, at *4 (D. Ariz. May 22, 2026).

*D.V.D.*, 2026 WL 521557, at *30 (cleaned up). Because the *D.V.D.* petitioners neither challenged their orders of removal nor the process resulting in those orders, the government's sovereign prerogative was not implicated. *Id.* at *30–31 (citing *Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021)). Hence, the entry fiction doctrine did not bar the petitioners' non-admissions due process challenges. *Id.* at *31.

In a truncated fashion, the court in *Padilla* refuted the government's entry fiction argument. There, the court rejected the government's claim that the entry fiction doctrine broadly applied to any due process challenge, noting that such an assertion "is untethered to the claim in *Thuraissigiam* and the [Supreme] Court's reasoning." *Padilla*, 704 F. Supp. 3d at 1171. Rather, the entry fiction doctrine is constrained "only [to] those rights regarding admission that Congress has provided by statute." *Id.* at 1172 (emphasis omitted) (quoting *Thuraissigiam*, 591 U.S. at 140). Hence, where a petitioner "do[es] not challenge the admission process in any way or assert a right to remain in the United States," the entry fiction doctrine does not apply. *Padilla*, 704 F. Supp. 3d at 1172.

To state the matter bluntly, a bond hearing—as discussed above—does not equate admissions. *See Rincon*, 810 F. Supp. 3d at 107 (noting that, if a petitioner were released following a bond hearing, they "will be subject to the same removal proceedings as before, with no new right to remain"). "Thus, Petitioner does not purport to invoke any 'rights regarding admission.'"[9] *Id.* at 110 (quoting *Thuraissigiam*, 591 U.S. at 140).

In any event, neither *Padilla* nor *D.V.D.* run afoul of the Supreme Court's *Thuraissigiam* and *Mezei* decisions. First, the Court in *Thuraissigiam* did not announce that all of a noncitizens' rights were limited to those Congress provided by statute. Rather, the Supreme Court's holding was a limited to "those rights *regarding admission* that Congress has provided by statute." *Thuraissigiam*, 591 U.S. at 140.

---

[9] *Cf. Counselman v. Hitchcock*, 142 U.S. 547, 565 (1892) ("Legislation cannot detract from the privilege afforded by the Constitution. It would be quite another thing if the Constitution had provided that no person shall be compelled in any criminal case to be a witness against himself, unless it should be provided by statute that criminating evidence extracted from a witness against his will should not be used against him. But a mere act of Congress cannot amend the Constitution, even if it should engraft thereon such a proviso."), *overruled on other grounds*, *Kastigar v. United States*, 406 U.S. 441 (1972).

Second, *Mezei* narrowly "concerns an alien immigrant permanently excluded from the United States on security grounds."[10] *Mezei*, 345 U.S. at 207, 216 ("An exclusion proceeding grounded on danger to the national security, however, presents different considerations; neither the rationale nor the statutory authority [provide] for such release exists."). Specifically, in *Mezei*'s dicta, the Supreme Court noted that "an alien on the threshold of initial entry stands on a different footing: '[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" *Mezei*, 345 U.S. at 212 (quoting *Knauff*, 338 U.S. at 544). To extend this broad statement to the conclusion that all arriving noncitizens lack constitutional protections "can withstand neither the weight of logic nor that of principle, and has never been incorporated into the fabric of our constitutional jurisprudence."[11] *Jean v. Nelson*, 472 U.S. 846, 869 (1985) (Marshall, J., dissenting). For if so, why then could the government not punish such noncitizens without "a judicial trial to establish the guilt of the accused," *Wong Wing v. United States*, 163 U.S. 228, 237 (1896), confiscate noncitizens' property without considering the Fifth Amendment protections, *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491–92 (1931), or completely loosened the reigns to give the political branch judicially unchecked power over admissions and exclusions of noncitizens? *Fiallo v. Bell*, 430 U.S. 787, 793 n.5 (1977) ("Our cases reflect acceptance of a limited judicial responsibility under the Constitution even with respect to the power of Congress to regulate the admission and exclusion of aliens[.]").

Finally, and most importantly, finding that a noncitizen possesses a cognizable liberty interest comports with the Supreme Court's extensive catalog of Fifth Amendment[12]

---

[10] Such a reading of *Mezei* comports with the "maxim[,] not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821).

[11] Regardless, as noted by our sister district, "the statutory scheme underpinning the decisions in *Mezei* and *Barrera-Echavarria* is no longer in effect," so it is of limited import in the context of § 1225(b) noncitizens. *Ramirez v. Sessions*, No. 18-cv-05188-SVK, 2019 U.S. Dist. LEXIS 234462, at *14 (N.D. Cal. Jan. 30, 2019); *R.A.N.O. v. Wofford*, 820 F. Supp. 3d 1094, 1101 n.4 (E.D. Cal. 2026) (same).

[12] It is also notable that, based upon an originalist view of the Fifth Amendment, that release upon bond—at least in the criminal context—was the norm, whereby imprisonment

decisions. The Supreme Court has noted that in American society, "liberty is the norm," which necessitates that civil detention "is the carefully limited exception." *Foucha v. Louisiana*, 504 U.S. 71, 83 (1992) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)); *Addington v. Texas*, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (noting that the petitioner's interest from confinement was "the most elemental of liberty interests—the interest in being free from physical detention by one's own government"); *cf. Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) ("The Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review") (citing *Boumediene v. Bush*, 553 U.S. 723, 781–83, 786 (2008)).

This contention is no less valid when considering that Petitioner is not a citizen, *see Yick Wo v. Hopkins*, 118 U.S. 356, 368–69 (1886), because "[t]he Fifth Amendment, as well as the Fourteenth Amendment, protects every one of" the "millions of aliens within the jurisdiction of the United States."[13] *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Reno v.*

---

until the conclusion of a proceeding was the exception. Now, it is true that the entry fiction and release on bond—as it relates to immigration—was a late Nineteenth Century construct designed to ensure arriving noncitizens would not be forced to remain in the "disgusting and demoralizing conditions of traditional, non-steamer immigrant ships[.]" Eunice Lee, *The End of Entry Fiction*, 99 N.C. L. REV. 565, 584–88 (2021). Hence, a perfect parallel cannot be drawn between immigration bond and practices at the time of the Fifth Amendment's ratification. However, a parallel may be drawn nonetheless to the colonial system of bail and release on bond prior to trial.

Bail as a legal construct arose "out of the pre-Norman system of amercements," slowly morphing through centuries of post-Magna Carta British common law to being "[a] right[] of Englishmen." Kellen R. Funk & Sandra G. Mayson, *Bail at the Founding*, 137 HARV. L. REV. 1816, 1827–28 (2024). At the time of this nation's founding, bail took two forms: (1) the Common Law Model which made bail discretionary in most cases; and (2) the Dissenter Model where prisoners enjoyed a right to bail by default in most every non-capital case. *Id.* at 1832–37. At the time of Articles of Confederation and at the naissance of our Constitutional democracy, the federal government and half of the states recognized the Dissenter Model. *Id.* at 1842–43. However, the Dissenter view soon became the majority after the admission of Connecticut, Delaware, and "all the states admitted from Vermont onwards[.]" *Id.* at 1843. Hence, at the ratification of the Fifth Amendment and soon thereafter, the founders recognized that, absent a criminal conviction, detention was to be the exception, with release on bond or similar suretyships as the norm.

[13] Of course, this finding "does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship." *Id.* at 78. The Constitution clearly provides Congress a "broad power over naturalization and immigration," including the

*Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.") (citing *The Japanese Immigration Case*, 189 U.S. 86, 100–01 (1903)); *Wong Wing*, 163 U.S. at 238 ("[I]t must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by th[e Fifth and Sixth Amendments], and that even aliens shall not be . . . be deprived of life, liberty, or property without due process of law."). In short, noncitizens possess a cognizable liberty interest from prolonged civil detention that is not precluded by the entry fiction doctrine.[14, 15]

***2. Due Process Rights Regarding Petitioner's Prolonged Detention*.**

Courts in this circuit and beyond have grappled over what test should be used to determine whether procedural due process requires relief for a noncitizen held pursuant to § 1225(b). *See Doe v. Andrews*, 1:25-cv-00333-JLT-HBK, at *15–17 (E.D. Cal. Mar. 23, 2026) (applying the 3-factor *Lopez* test); *see also Galkin v. Scott*, No. 2:26-cv-00530-TLF, 2026 U.S. Dist. LEXIS 46838, at *7 (W.D. Wash. Mar. 6, 2026) (applying the 6-part *Banda* test) (citing *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1118 (W.D. Wash. 2019)); *Leonteva v. Noem*, No. 4:26-cv-00043-SEB-KMB, 2026 U.S. Dist. LEXIS 52217, at *22 (S.D. Ind. Mar. 13, 2026) (applying the same 6-factor test, but calling it the *Jamal A* test) (*citing Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 858–59 (D. Minn. 2019)); *L.S. v. Warden, Otay Mesa Det. Ctr.*, No. 25-cv-3598-LL-BJW, 2026 U.S. Dist. LEXIS 10299, at *11–15 (S.D. Cal. Jan. 20, 2026) (applying the 3-part *Mathews v. Eldridge* test) (citing *Mathews*, 424 U.S. at 335).

Out of the abovementioned tests, the Court finds the *Banda* test the most applicable

---

power to "make[] rules that would be unacceptable if applied to citizens." *Id.* at 80–81. The instant findings do not subvert these notions.

[14] "[T]his maxim is ever invariably observed, that no fiction shall extend to work an injury[.]" 3 WILLIAM BLACKSTONE, COMMENTARIES *43.

[15] "No one can claim, nor since the time of slavery has anyone to my knowledge successfully claimed, that persons held within the United States are totally without constitutional protection. Whatever the fiction, would the Constitution leave the Government free to starve, beat, or lash those held within our boundaries? If not, then, whatever the fiction, how can the Constitution authorize the Government to imprison arbitrarily those who, whatever we might pretend, are in reality right here in the United States? The answer is that the Constitution does not authorize arbitrary detention." *Jennings v. Rodriguez*, 583 U.S. 281, 332 (2018) (Breyer, J., dissenting).

to the situation at hand. Under the *Banda* test, the Court considers the following factors:

> (1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings caused by the government; and (6) the likelihood that the removal proceedings will result in a final order of removal.

*Banda*, 385 F. Supp. 3d at 1118.

The Court finds the *Banda* test more suitable than the *Mathews*[16] and *Lopez*[17] tests. Regarding the *Mathews* test, the Court concurs with other district courts that have found that "while the *Mathews* factors may be well-suited to determining whether due process requires a second bond hearing, they are not particularly dispositive of whether prolonged mandatory detention has become unreasonable in a particular case." *Lopez*, 631 F. Supp. 3d at 879. Put differently, the *Mathews* test is apt where the question is whether an administrative procedure provided is "constitutionally sufficient," but "[i]t does not resolve the more fundamental issue of whether any procedure—such as a bond hearing—must be provided."[18] *Banda*, 385 F. Supp. 3d at 1106–07.

---

[16] Under the *Mathews* test, the Court considers "First, the private interest that will be affected by the official action"; second, the "risk of an erroneous deprivation"; and "finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

[17] Because the *Lopez* test concerns due process challenges to mandatory detention under § 1226(c), *see Andrews*, 1:25-cv-00333-JLT-HBK, at *14, not under 1225(b), the elects to apply the six-factor *Banda* test.

[18] In any event, the outcome applying *Mathews* and *Banda* would be the same—*i.e.*, Petitioner would be entitled to an individualized bond hearing. Applying the first *Mathews* element, undersigned finds that Petitioner has a strong private interest in their liberty from prolonged civil detention. *See Hernandez v. Sessions*, 872 F.3d 976, 993 (9th Cir. 2017) ("As to the first factor, the private interest at issue here is 'fundamental': freedom from imprisonment is at the 'core of the liberty protected by the Due Process Clause.'") (quoting *Foucha*, 504 U.S. at 80).

Turning to the second element, considering the prolonged nature of Petitioner's detention, the Court finds a large risk of erroneous deprivation in the absence of an individualized bond hearing. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1144 (9th Cir. 2013) (noting that the discretionary parole system envisioned under the Immigration and Naturalization Act is insufficient "to overcome the constitutional concerns raised by prolonged mandatory detention"). Hence, an individualized bond hearing would greatly mitigate the risk of a continued constitutional violation.

Finally, regarding the third *Mathews* factor, the government interest in detaining Petitioner without an individualized bond hearing is low. First, "[p]roviding petitioner with a bond hearing would not impede respondents' interest in effecting removal or protecting the public, as the purpose of the bond hearing is to determine whether petitioner is a danger

*i. Length of Detention.*

The first *Banda* factor is the length of detention, "which is the most important factor." *Banda*, 385 F. Supp. 3d at 1118. "It is important to bear in mind the context: [t]he detention that is being examined here is the detention of a human being who has never been found to pose a danger to the community or to be likely to flee if released." *Id.* (quoting *Jamal A.*, 358 F. Supp. 3d at 859).

Petitioner has been held in DHS custody for 16 months. Under the first *Banda* factor, where a petitioner's current detention exceeds a six-month threshold their "detentions become less and less reasonable." *Haidari v. Immigr. & Customs Enf't Field Off. Dir.*, No. 2:26-cv-00039-TL, 2026 U.S. Dist. LEXIS 56882, at *8 (W.D. Wash. Mar. 18, 2026) (quoting *L.B.O.M. v. Hermosillo*, No. 2:25-cv-02695-GJL, 2026 U.S. Dist. LEXIS 21291, at *8 (W.D. Wash. Feb. 2, 2026).

Petitioner has been detained for 16 months. This is well beyond the six-month threshold, and well beyond the length of confinement other courts have found to be prolonged. *See, e.g.*, *Liang Ding v. Noem*, No. 1:26-cv-01217-DJC-SCR, 2026 U.S. Dist. LEXIS 58212, at *3–4 (E.D. Cal. Mar. 19, 2026) (noting that an eight-month detention is sufficiently prolonged to warrant granting relief); *Amado v. U.S. Dep't of Just.*, No. 25-cv-2687-LL (DDL), 2025 U.S. Dist. LEXIS 217453, at *14 (S.D. Cal. Nov. 4, 2025) ("To date, [p]etitioner has been in detention for approximately thirteen months. Courts have found detention over seven months without a bond hearing weighs toward a finding that it is unreasonable."); *Kadir v. Larose*, No. 25cv1045-LL-MMP, 2025 U.S. Dist. LEXIS

---

or flight risk." *Jensen v. Garland*, No. 5:21-CV-01195-CAS (AFM), 2023 WL 3246522, at *6 (C.D. Cal. May 3, 2023). Second, the fiscal burden of providing an individualized bond hearing is low. *See Abduraimov v. Andrews*, No. 1:25-CV-00843-EPG-HC, 2025 WL 2912307, at *7 (E.D. Cal. Oct. 14, 2025) ("Courts generally have found that the cost of providing a bond hearing is relatively minimal, and there is nothing in the record before this Court demonstrating that providing Petitioner with a bond hearing would be fiscally or administratively burdensome."); *cf. Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (noting that "[t]he costs to the public of immigration detention are 'staggering': $158 each day per detainee, amounting to a total daily cost of $6.5 million. Supervised release programs cost much less by comparison: between 17 cents and 17 dollars each day per person"). Therefore, the third factor minimally favors the government. Accordingly, applying the *Mathews* test to Petitioner's 16-month detention, undersigned concludes that due process requires they be provided with individualized bond hearings.

203614, at *13 (S.D. Cal. Oct. 15, 2025) (noting that 13 months without a bond hearing is prolonged); *cf. Banda*, 385 F. Supp. 3d at 1118 ("Petitioner has been in detention for approximately 17 months, which is a very long time."). In light of these decisions, and based upon the facts of the instant action, the Court finds the length of Petitioner's detention strongly favors granting relief.

*i. Likely Duration of Future Detention.*

The second factor requires the Court to "consider[] how long the detention is likely to continue absent judicial intervention; in other words, the anticipated duration of all removal proceedings—including administrative and judicial appeals." *Banda*, 385 F. Supp. 3d at 1119 (citation omitted). "When the alien's removal proceedings are unlikely to end soon, this suggests that continued detention without a bond hearing is unreasonable." *Akmal v. Warden of Cal. City Det.*, No. 1:25-CV-01921-DC-DMC-HC, 2026 U.S. Dist. LEXIS 48058, at *17 (E.D. Cal. Mar. 9, 2026) (quoting *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 211 (3d Cir. 2020)).

While the length of future detention is uncertain considering Petitioner's appeal to the BIA, the Court finds that the likely duration of future detention is sufficiently lengthy for this factor to favor Petitioner. *See Kadir*, 2025 U.S. Dist. LEXIS 203614, at *8 ("Petitioner's future detention can last several more months or even years during the adjudication of Respondents' appeal to the BIA."); *see also Liang Ding*, 2026 U.S. Dist. LEXIS 58212, at *4 ("[E]ither party may seek Ninth Circuit review of the [BIA's] decision. Therefore, [p]etitioner faces indefinitely prolonged detention while administrative and potentially judicial appeals of his removal order are decided. Thus, this factor weighs in [p]etitioner's favor.").

*ii. Conditions of Detention.*

The third factor requires the Court to consider the conditions of confinement. *Banda*, 385 F. Supp. 3d at 1119. "The more that the conditions under which the [noncitizen] is being held resemble penal confinement, the stronger his argument that he is entitled to a bond hearing." *Id.* (citation omitted). Neither party has addressed Petitioner's conditions

of detention. Hence, the Court finds this factor neutral.

*iii. Delays in Removal Proceedings*.

Next, the Court shall analyze the "fourth and fifth [*Banda*] factors—both which consider delays caused by the parties—together." *Maliwat v. Scott*, No. 2:25-CV-00788-TMC, 2025 U.S. Dist. LEXIS 152663, at *15 (W.D. Wash. Aug. 7, 2025).

The fourth factor requires the Court to consider the nature and extent of any delays caused by Petitioner. "Courts should be sensitive to the possibility that dilatory tactics by the removable noncitizen may serve not only to put off the final day of deportation, but also to compel a determination that the noncitizen must be released because of the length of his incarceration." *Banda*, 385 F. Supp. 3d at 1119 (cleaned up).

In the instant action, Petitioner has appealed the IJ's order of removal. While it is true that Petitioner has delayed his own removal, the Court does not find that this was a dilatory tactic aimed at extending his detention so he could then seek release. Regardless, based on a review of our sister districts' caselaw, the Court is persuaded that a petitioner "should not be effectively punished through indefinite detention for exercising her right to appeal her removal order." *Yuehui Chen v. Noem*, No. 5:26-CV-00397-SSS-DTB, 2026 U.S. Dist. LEXIS 31999, at *15 (C.D. Cal. Feb. 13, 2026); *Marroquin Ambriz v. Barr*, 420 F. Supp. 3d 953, 964 (N.D. Cal. 2019) ("But the government's suggestion that Petitioner's choice to appeal adverse rulings weighs against any constitutional claim that he may make regarding his detention during the course of the appeal is untenable, and the Court will not require that a petitioner who pursues his available legal remedies must forego any challenge to the reasonableness of his detention in the interim.") (cleaned up); *Barraza v. ICE Field Office Dir.*, No. C23-1271-BHS-MLP, 2023 U.S. Dist. LEXIS 235170, at *15 (W.D. Wash. Dec. 8, 2023), *report and recommendation adopted sub nom. Barraza v. U.S. Immigr. & Customs Enf't Field Off. Dir.*, No. C23-1271 BHS, 2024 U.S. Dist. LEXIS 23423 (W.D. Wash. Feb. 9, 2024) ("Petitioner is entitled to raise legitimate defenses to removal . . . and such challenges to his removal cannot undermine his claim that detention has become unreasonable.") (citing *Liban M.J. v. Sec. of Dep't of Homeland Sec.*, 367 F. Supp. 3d 959,

965 (D. Minn. 2019)); *Henriquez v. Garland*, No. 5:22-cv-00869-EJD, 2022 U.S. Dist. LEXIS 106045, at *12 (N.D. Cal. June 7, 2022) (finding that delays caused by the petitioner to "develop affirmative relief in the face of his removability . . . . does not deprive him of a constitutional right to due process," especially because "the proceedings have been significantly prolonged for reasons beyond his control."). Hence, the fourth factor minimally favors Respondents.

The fifth factor considers the delays in removal caused by the government. *Banda*, 385 F. Supp. 3d at 1120. "[I]f immigration officials have caused delay, it weighs in favor of finding continued detention unreasonable . . . Continued detention will also appear more unreasonable when the delay in proceedings was caused by the immigration court or other non-ICE government officials." *Galkin*, 2026 U.S. Dist. LEXIS 46838, at *11 (quoting *Sajous v. Decker*, No. 18-cv-2447 (AJN), 2018 U.S. Dist. LEXIS 86921, at *35 (S.D.N.Y. May 23, 2018)). While Petitioner's appeal has caused a delay in his removal, the Court notes that "any 'delay in this case is a product of the BIAs and Ninth Circuit's 'crowded dockets,' which courts typically attribute to the Government—not the Petitioner." *Galkin*, 2026 U.S. Dist. LEXIS 46838, at *11 (quoting *Djelassi v. Ice Field Off. Dir.*, 434 F. Supp. 3d 917, 923 (W.D. Wash. 2020)). Hence, the fifth factor slightly favors Petitioner.

*iv. Likelihood of Removal.*

The final *Banda* factor requires the Court to consider "the likelihood that the final proceedings will culminate in a final order of removal." *Banda*, 385 F. Supp. 3d at 1120 (citation omitted). "[W]here a noncitizen has asserted a good faith challenge to removal, 'the categorical nature of the detention will become increasingly unreasonable.'" *Id.* (quoting *Sajous*, 2018 U.S. Dist. LEXIS 86921, at *37). Based on the current record, "the Court lacks sufficient information to comment on the potential merits of [P]etitioner's pending appeal." *Galkin*, 2026 U.S. Dist. LEXIS 46838, at *12. Therefore, the sixth factor is neutral.

*v. Conclusion.*

Considering three of the *Banda* factors favor Petitioner, one factor slightly favors

Respondents, and two factors are neutral, the Court concludes that Petitioner's continued detention under § 1225(b)(2) has become unreasonable. Therefore, Petitioner is entitled to relief.

**C. Remedy**.

Where a noncitizen's detention under § 1225(b)(2) has become unreasonable, the proper remedy is an individualized bond hearing before a neutral IJ. *See Galkin*, 2026 U.S. Dist. LEXIS 46838, at *12 (finding that "there is no authority" supporting relief in the form of immediate release, but there is authority supporting relief in the form of a bond hearing) (cleaned up); *see also Lopez*, 631 F. Supp. 3d at 882 ("The Court finds, consistent with other post-*Jennings* cases, that the appropriate remedy is a bond hearing before an immigration judge rather than immediate release."); *Kaur v. Lyons*, 2:26-cv-00217-KML, at *1 (D. Ariz. Apr. 9, 2026) (adopting the magistrate judge's recommendations for a 1225(b)(2) petitioner and granting a bond hearing).

At the bond hearing, Respondents bear the burden of proving that Petitioner is a danger or flight risk by clear and convincing evidence. *Singh v. Holder*, 638 F.3d 1196, 1203–05 (9th Cir. 2011). Additionally, "[i]n the event Petitioner is 'determined not to be a danger to the community and not to be so great a flight risk as to require detention without bond,' the [IJ] should consider Petitioner's financial circumstances and alternative conditions of release." *also Liang Ding*, 2026 U.S. Dist. LEXIS 58212, at *7 (quoting *Hernandez v. Sessions*, 872 F.3d 976, 1000 (9th Cir. 2017)).

Accordingly,

**IT IS RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus (doc. 1) be **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER RECOMMENDED** that Petitioner's request for immediate release be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Petitioner be provided an individualized bond hearing within **SEVEN (7) DAYS** of the adoption of this Report and Recommendation. This bond hearings shall comply with the procedural requirements set

out in *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011). The government shall bear the burden of proving that Petitioner is a danger or flight risk by clear and convincing evidence. Additionally, the IJ should consider Petitioner's financial situation and alternative conditions of release. *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017). **IN THE ALTERNATIVE**, the government may release Petitioner under appropriate conditions of release.

**IT IS FURTHER RECOMMENDED** that Petitioner **SHALL** be provided with adequate notice prior to the hearing.

**IT IS FURTHER RECOMMENDED** that the government shall file a status report with the Court regarding the bond hearing and whether Petitioner was released within **FOURTEEN (14) DAYS** if this Report and Recommendation is adopted.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment. The Parties shall have 14 days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See* 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 6, 72. Thereafter, the Parties have 14 days within which to file a response to the objections.

Failure to file timely objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure to file timely objections to any factual determinations of the Magistrate Judge may be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See* Fed. R. Civ. P. 72.

Dated this 13th day of July, 2026.

Honorable John Z. Boyle
United States Magistrate Judge